Receipt number 9998-5117367

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| JOHN CRAWFORD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. ___18-1956 C___ |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendant, ) | |
| ) | |

## COMPLAINT

## <u>INTRODUCTION</u>

1.      This case arises from the failure of the Unites States Department of the Army ("Army") to honor its clear and explicit duty—embodied by statute and regulation—that it not abandon its fallen or wounded, or leave them behind.

2.      The Plaintiff, John Crawford ("Plaintiff" or "Mr. Crawford"), is a veteran of the on-going War on Terror, having served multiple combat deployments to Iraq, where he served as a combat flight medic.  As a result of his service, Mr. Crawford suffers from Post-Traumatic Stress Disorder ("PTSD").  In 2010, the Army decided that Mr. Crawford's PTSD caused him to fail the medical retention standards set forth in Army Regulation ("AR") 40-501 and required his discharge.

3.      Having found that Mr. Crawford's PTSD failed the Army's medical standards, the Army should have contemporaneously referred Mr. Crawford for Physical Disability Evaluation System ("PDES") processing, including the opportunity to have a full and fair Physical Disability Evaluation Board ("PEB") hearing.  However, at the time of his discharge, the Army erroneously determined Mr. Crawford's PTSD to be non-service-connected, failed to provide

1

Mr. Crawford with a PEB hearing, and wrongfully denied Mr. Crawford a military medical retirement and the benefits associated with such retirement.

4.      In a February 23, 2017 opinion, the Army Board of Corrections for Medical Records ("ABCMR") ***acknowledged*** that Mr. Crawford was discharged due to PTSD that he incurred in the line of duty and that the Army was wrong when it failed to counsel Mr. Crawford regarding his right to request a PEB hearing and discharged Mr. Crawford without providing him due process.

5.      Despite recognizing that Mr. Crawford was discharged due to his PTSD incurred in the line of duty, and was wrongly denied the right to PDES processing and the subsequent right to a PEB hearing at the time of his discharge (further violating his due process rights), the ABCMR compounded the Army's original error by again refusing to provide Mr. Crawford with meaningful relief for either issue: failing to provide him with the status and benefits he is entitled to by law and, in the alternative, failing to provide him with due process by referring him to a PEB for a determination of whether he was fit for continued military service due to his PTSD at the time of his discharge.

6.      Instead, the ABCMR erroneously recommended that Mr. Crawford be referred back to the start— recommending he be referred back to the Office of the Surgeon General to determine if he should have been referred for PDES processing.  Moreover, the ABCMR's decision also recommended that Mr. Crawford should be referred to a Medical Evaluation Board ("MEB") for another determination as to whether he failed retention standards, which is also inappropriate under these circumstances.

7.     The ABCMR's decision is arbitrary and capricious because it ignores the undisputable facts that show Mr. Crawford was already discharged solely because his service-incurred PTSD, previously found to fail medical retention standards, made him unfit to serve.

8.     Because Mr. Crawford's PTSD had already been found to be in the line of duty, to fail medical retention standards, to be the reason for his discharge, and to merit at least a 30 percent permanent rating, there was only one logical conclusion supported by the facts: Mr. Crawford's record should have been corrected to reflect a military medical retirement and all benefits that status bestows.

9.     The ABCMR's failure to directly provide Mr. Crawford a military medical retirement, and the subsequent decision by Dr. Kathryn O'Donnell, IDES Director at Fort Belvoir Community Hospital, denying that Mr. Crawford failed medical retention standards at the time of his discharge, are arbitrary, capricious, contrary to law, and unsupported by substantial evidence.

## NATURE OF THE ACTION

10.     This is an action challenging the Army's unlawful failure to award Plaintiff disability retirement pay and benefits afforded by a military medical retirement due to Plaintiff's PTSD.

11.     Title 10 of the U.S. Code and Army regulations require that soldiers who are deemed unfit to perform their duties due to injuries incurred in the line of duty that are rated at least 30% disabling under the Department of Veterans Affairs Schedule for Rating Disabilities ("VASRD") are entitled to a military medical retirement and the corresponding benefits.  Despite the overwhelming evidence that Mr. Crawford met these criteria at the time of his discharge, the

Army failed to provide him with such benefits or the proper process that would have resulted in award of his military medical retirement and benefits under 10 U.S.C. § 1201.

12.     Moreover, as acknowledged by the ABCMR, the Army failed to properly notify Mr. Crawford that its actions entitled him to request a hearing in front of a PEB prior to his separation, in contravention of AR 40-501, ¶ 10-25.

13.     When Mr. Crawford sought correction of the Army's errors at the ABCMR, the ABCMR improperly continued to deny Mr. Crawford the benefits he is entitled to and instead referred him to Office of the Surgeon General to determine whether he should have been referred to the PDES prior to his discharge.  This error was further compounded when Dr. O'Donnell refused to refer Mr. Crawford to the PEB, despite the clear evidence that Mr. Crawford was, in fact, discharged due to his failure to meet retention standards in accordance with AR 40-501.

14.     The ABCMR's decision denying Mr. Crawford the status and benefits he is rightly owed under 10 U.S.C. § 1201, and further denying him due process, and Dr. O'Donnell's subsequent refusal to refer Mr. Crawford to the PEB are arbitrary, capricious, contrary to law, and unsupported by substantial evidence and should be overturned.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1).  The statutory basis for invoking jurisdiction is 10 U.S.C. § 1201.  Section 1201 requires the payment of disability retirement compensation once a disability is found qualifying and, therefore, constitutes a money-mandating provision.

16.     In accordance with 28 U.S.C. § 2501, this action is brought within six years of the ABCMR's partial denial of Mr. Crawford's request for correction of his record and Dr. O'Donnell's decision denying further processing through the PDES.

17.     Plaintiff was never afforded with the opportunity to have his records reviewed by a PEB, and was not counseled regarding his right to seek such a review.

18.     The ABCMR was the first competent board to review Plaintiff's disability retirement claim.  The ABCMR partially denied Plaintiff's claim on February 28, 2017.

19.     At the direction of the ABCMR, Dr. O'Donnell, acting on behalf of the MEB section at Fort Belvoir Community Hospital, undertook a further review of Plaintiff's file to determine his eligibility for PDES processing at the time of his discharge.  Dr. O'Donnell denied Plaintiff further PDES processing on April 5, 2017, effectively precluding him from receiving his rightful military medical retirement.

20.     Both the ABCMR's decision and Dr. O'Donnell's decision fall within the six year statute of limitations set forth by the Tucker Act.  Therefore, Plaintiff's challenge in this Court is timely and this Court has jurisdiction over his claim.

## PARTIES

21.     Staff Sergeant John William Crawford is a citizen of the United States and served honorably in the United States Army from July 3, 1991 until March 13, 2001, and then in the Florida Army National Guard from March 14, 2001 until the date of his discharge on June 22, 2011.

22.     The Defendant is the United States of America, acting by and through the Department of the Army, an agency of the United States government.  This Complaint may interchangeably refer to the Defendant as the "United States," "Defendant," "Army," or "FLARNG."

# FACTUAL ALLEGATIONS

## PTSD Background

23.     PTSD is a mental health disorder that can develop after an individual experiences, witnesses, or undergoes a traumatic event, one that often causes or threatens grave physical harm or death to that person or others involved in the incident.

24.     PTSD was classified by the American Psychiatric Association as a distinct mental health disorder in 1980.  Prior to 1980, U.S. Armed Services personnel suffering from combat-stress related disorders were commonly classified as suffering from "shell shock," "combat fatigue," or "traumatic war neurosis."  The recognition of PTSD as a distinct mental health disorder has enabled mental health professionals to provide early assessment and diagnosis of the condition so that individuals can receive intervention and proper treatment, thus enabling them to cope with the effects of this devastating disorder and lead healthy and fulfilling lives.

25.     Almost 2 million U.S. Armed Services personnel have been deployed around the world as part of the U.S. efforts to combat global terrorism.  Countless numbers of these service men and women have been exposed to traumatic events during combat, and many have returned home with a variety of psychological and mental injuries, including PTSD.  Indeed, Operation Enduring Freedom (the official name of the war in Afghanistan) and Operation Iraqi Freedom (the official name of the war in Iraq) have produced an unprecedented number of service personnel suffering from PTSD, making PTSD the most prevalent psychological disorder resulting from these conflicts.

26.     The Department of Veterans Affairs has reported that up to 20% of the veterans who served in Afghanistan or Iraq may have PTSD.

27.     Service personnel that suffer from PTSD exhibit a wide range of symptoms. Those afflicted may suffer crippling flashbacks that cause them to replay the traumatic event or events; others may tend to avoid places, people, or other things that may remind them of the triggering event, thus compromising the daily routine of ordinary life.  Many may experience trouble controlling emotions and exhibit abnormal irritability or anger to those around them. Victims of PTSD also may have difficulty concentrating, have long or short-term memory loss, swing from pangs of grief to emotional numbness, suffer from depression, or have trouble sleeping.  These and other symptoms may last for minutes, or continue for days, weeks, or years.

28.     A veteran suffering from PTSD faces daunting obstacles as a result of his or her injury, including, but not limited to: difficulty readjusting to work or maintaining employment; difficulty interacting with others; feelings of estrangement or detachment; nightmares and sleep deprivation; impaired functioning; occupational instability; memory disturbances; and family, parenting or marital discord.

29.     Although presently PTSD has no known cure, early treatment can help lessen the severity and symptoms of PTSD and help those veterans afflicted by it lead healthy and fulfilling lives.

**Military Disability Evaluation System**

30.     The Plaintiff was diagnosed with PTSD during his military service, which the Army, via a State Surgeons Medical Discharge Review Board ("SSMDRB"), found to fail the medical retention standards set forth in Chapter 3 of AR 40-501 on November 3, 2010.  Mr. Crawford, despite having 18 years, 11 months and 14 days of service, was subsequently subject to administrative elimination from the Army without PDES processing.

31.     In administratively separating Mr. Crawford from service, the Army treated Mr. Crawford's PTSD as if it were not service-incurred, denying him the PDES processing to which he was lawfully entitled.

32.     As a consequence, Mr. Crawford has been denied the military medical retirement to which he is lawfully entitled and the conferring benefits of such a retirement, including monthly monetary compensation and access to Tricare, which would provide medical treatment to mitigate the severity and symptoms of his condition and enable him to lead a more normal, productive life.

33.     The Army's failure to properly designate Mr. Crawford's PTSD disability as one that qualified him for a military medical retirement was arbitrary, capricious, and contrary to law and has deprived this disabled soldier the essential support to which 10 U.S.C. § 1201 entitles him.

34.     Medical retirement is issued when a service-connected medical condition(s) is severe enough to interfere with the proper performance of a soldier's military duties and the combined injury is rated at 30% or more by the VA.

35.     Chapter 61 of Title 10 of the United States Code establishes the process through which the Army discharges disabled soldiers.  It authorizes the Secretaries within the Department of Defense, including the Secretary of the Army, to separate a member of the armed forces when it is determine that the member is "unfit" to perform the duties of his office, grade, rank, or rating due to physical or mental disability.  This chapter also provides the Secretary with broad discretion to design the regulations for determining fitness.  *See* 10 U.S.C. § 1216(a)-(b).

36.     AR 635-40 establishes the Army PDES under the provisions of Title 10, United States Code, Chapter 61 and Department of Defense Instruction 1332.18.

37.     The PDES consists of several phases of evaluation and review that result in a final disability determination for a soldier.

38.     Under the then-operative regulation, the PDES process begins when a soldier's commander, the commander of the medical treatment facility treating the soldier, or the Commander, U.S. Army Human Resources Command, refers the solder for medical evaluation. AR 635-40, ¶¶ 4-6 to 4-8.[1]  A soldier cannot self-refer into the PDES.

39.     After referral, the first phase of the PDES process consists of an MEB where, based on AR 40-501, Chapter 3, a soldier's medical status, duty limitations, and medical qualification for retention are documented.  *Id.* ¶ 4-10. Under AR 40-501, ¶ 10-25, soldiers that are pending separation for conditions incurred in the line of duty ("ILOD") are processed through referral to an MEB in the first instance in accordance with the normal PDES process set forth by AR 635-40.

40.     Soldiers that are pending separation for conditions incurred not in the line of duty ("NILOD") are not processed through an MEB or under AR 635-40.  Instead, the State Surgeon is responsible for conducting the appropriate examinations.  *See* AR 40-501, ¶ 10-25.

41.     In a normal ILOD case that comes before an MEB, the MEB evaluates the soldier through a series of examinations.  If, after such evaluation, the MEB determines that the soldier's physical or mental conditions fall below the retention standards set forth in AR 40-501, then the MEB refers the soldier to the PEB for a fitness determination.  *See* AR 635-40.

42.     Soldiers processed as NILOD that have not been evaluated by an MEB but are deemed by the State Surgeon to have failed retention standards are still eligible to request a

---

[1]     The Army amended AR 635-40 effective January 19, 2017.  The governing regulation at the time of the Army's evaluation and discharge of Plaintiff was promulgated February 8, 2006, as amended by Rapid Action Revision issued March 20, 2012.  The 2017 update to this regulation addressing DES referrals does not impact Plaintiff's present claim.

fitness determination from a PEB and must be notified in writing of their right to request such a review.  AR 40-501, ¶ 10-25.

43.     A PEB is the sole forum responsible for determining a soldier's unfitness for duty as a result of a physical or mental disability.  A PEB can render a determination of unfitness only when a disability rises to the level of interrupting a soldier's service career.  To determine fitness, the PEB: (1) investigates "the nature, cause, degree of severity, and probable permanency" of the referred soldier's disability; (2) evaluates "the physical condition of the [s]oldier against the physical requirements of the [s]oldier's particular office, grade, rank, or rating;" (3) provides "a full and fair hearing" for the soldier as required by 10 U.S.C. § 1214; and (4) makes "findings and recommendations required by law to establish the eligibility of a [s]oldier to be separated or retired because of physical disability."  *Id.* ¶ 4-17.  All PEB findings must be based on a preponderance of the evidence, and its recommendations must be supported by the findings. *Id.* ¶ 4-19(a).

44.     The PEB process has four possible outcomes.  A soldier can be:

  a.  Found ***fit for duty***;

  b.  Found ***unfit for duty but ineligible for disability benefits*** because, among other reasons, the disabling condition was not incurred in the line of duty, existed prior to service, was the result of intentional misconduct or willful neglect, or was incurred during an unauthorized absence;

  c.  Found ***unfit for duty and eligible for medical retirement*** with monthly disability retirement pay and other benefits; or

  d.  Found ***unfit for duty and eligible for medical separation*** with disability severance pay.

45.     If a soldier is found unfit and eligible for disability benefits (that is, under outcomes "c" or "d" above), then the PEB must assign a percentage disability rating for each unfitting condition.  A PEB's disability rating controls the amount of military benefits and

services to which the soldier is entitled upon discharge.  The rating, when above 30 percent,

dictates that a soldier is "medically retired" with monthly disability retirement pay and other

benefits such as lifetime health care coverage, and military commissary and exchange privileges

(outcome "c"); when below 30 percent, the soldier is "medically separated" with a one-time

lump sum severance payment and no additional benefits (outcome "d").  *See* 10 U.S.C. §§ 1201,

1203.

46.     Title 10 of the U.S. Code and the rules of each of the service branches have long

mandated that the armed forces follow the VASRD when rating the disability of soldiers found

unfit for duty due to physical or mental disability.  *See* 10 U.S.C. §§ 1201, 1203; National

Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-118, § 1642(a), 122 Stat 465,

codified at 10 U.S.C. § 1216a.

47.     The VASRD dictates that a soldier found unfit due to PTSD receive a minimum

50% disability rating for PTSD for the first six months post-discharge with a re-evaluation

thereafter to determine a permanent disability rating.  *See* 38 C.F.R. § 4.129.

**Plaintiff's Military History**

48.     Mr. Crawford enlisted in the Army on July 3, 1991.  He served as a medic on

active duty until March 13, 2001.  During his service, Mr. Crawford deployed to various theaters

of engagement including Somalia in 1993-94, and Albania and Kosovo in 1999 in support of

NATO efforts during the Kosovo Campaign.

49.     On March 14, 2001, Mr. Crawford enlisted in the Florida Army National Guard

("FLARNG") as a combat medic, where he continued his service.  During his time in the

FLARNG, Mr. Crawford was repeatedly called back to active duty to support the Army's

ongoing efforts in the War on Terror.

50.     Mr. Crawford was ordered to activity duty on January 27, 2003 serving in Kuwait and Iraq from April 21, 2003 through March 26, 2004.

51.     Mr. Crawford was again ordered to active duty on June 3, 2006 as a flight medic, deploying to Iraq from September 19, 2006 until September 9, 2007, where he saw significant action and his unit came under heavy fire during several missions.

52.     Following this second deployment to Iraq, Mr. Crawford began to display symptoms of PTSD.

53.     In October 2007, Mr. Crawford's medical records show that he received treatment at the Martin Army Community Hospital for various medical conditions, including "Adjustment Disorder with Anxious Mood."

54.     In January 2008, the VA granted Mr. Crawford's request for service-connected physical disability with a rating of 30% for PTSD and an overall combined rating for 40% for VA disability compensation purposes.  In 2010, the VA increased Mr. Crawford's PTSD disability rating to 50%.

55.     Mr. Crawford's VA medical records from that time further outline his struggles with PTSD.  His March 2008 VA psychiatry consultation records document a history of adjustment disorder tracing back to his recent deployments to Iraq.  The records show that Mr. Crawford reported that he witnessed numerous combat injuries and mangled bodies given that his unit was repeatedly under attack.

56.     Mr. Crawford's records also indicate that, during the 2008-2009 timeframe, he had issues with his college studies and exhibited significant emotional symptoms, flashbacks, nightmares, and that he was using alcohol as a sleep aid.  His PTSD screening was positive and the physician's note indicate that his PTSD was related to combat.

57.     In April 2010, the FLARNG sent a memorandum to Mr. Crawford's commander, indicating that Mr. Crawford's recent medical assessment designated him as an "S3", which denotes that the patient has a psychiatric condition or defect that may require significant limitations.

58.     The memorandum also stated that, in accordance with AR 40-501, ¶ 10-10, Mr. Crawford's S3 finding required that his medical records be reviewed by the SSMDRB to determine if he met medical retention standards.

59.     The SSMDRB conducted a review of Mr. Crawford's file and obtained further statements to assess whether Mr. Crawford met the applicable medical retention standards.

60.     An October 2010 Behavioral Health Provider Statement confirmed the diagnosis of PTSD and indicated that Mr. Crawford should not be assigned any combat role due to concerns with exacerbation of his PTSD symptoms.

61.     This diagnosis was confirmed by his October 2010 Physician's Statement, which further noted that Mr. Crawford may be unable to function to defend himself or others in a crisis situation due to his PTSD symptoms.

62.     In the Commander's Statement from October 2010, Mr. Crawford's commanding officer indicated that Mr. Crawford was not able to perform his duties during peacetime or wartime because he had issues being around trauma patients.  This, of course, was a serious issue given Mr. Crawford's position as a flight medic.

63.     On November 3, 2010, the SSMDRB found that Mr. Crawford failed the retention standards set forth in Army Regulation 40-501.  The SSMDRB wrote in the remarks section of its decision "MEB/PEB", "Non-Deployable – 3-33(b)", "Not fit for duty", and "LOD for PTSD".

64.     On that same day, the Florida Deputy State Surgeon sent a letter to Mr. Crawford's commanding officer stating that Mr. Crawford did not meet medical retention standards in accordance with Chapter 3, AR 40-501 (Standards of Medical Fitness).

65.     Importantly, despite the SSMDRB finding that indicated Mr. Crawford's case should have been processed as in the line of duty, which would have necessitated a referral for full PDES processing starting with review by an MEB, the FLARNG apparently processed Mr. Crawford's case under AR 40-501, ¶ 10-25(a), "Not in the Line of Duty", because the FLARNG indicated that Mr. Crawford's next step would be to request a referral to a PEB.  This effectively meant that the SSMDRB served as the MEB in deciding that Mr. Crawford failed medical retention standards per AR 40-501, ¶ 10-25 (a)(3).

66.     The FLARNG's letter stated that "IAW AR 40-501, para 10-25, Soldier may request referral to a Physical Evaluation Board (PEB) for a determination of fitness."  The letter directed that this information should be provided to Mr. Crawford stating that "[t]he unit commander needs to counsel, DA 4856, the Soldier in regards to the board action.  In addition, the commander needs to address what the Soldier can do next."

67.     Mr. Crawford was never provided with a copy of the FLARNG letter prior to his separation from service.  Although AR 40-501, ¶ 10-25 holds that a soldier may request referral to the PEB for determination of fitness by submitting a request in writing to the SSMDRB not later than five days prior to the effective date of the discharge, Mr. Crawford was not counseled, as required, by his unit commander of this option.

68.     Without the proper notification of his rights, Mr. Crawford was discharged from the Army National Guard on June 22, 2011 for failure to meet medical retention standards due to his PTSD, as found by the SSMDRB.

69.     On June 24, 2011, Mr. Crawford was notified of his eligibility for retired pay at age 60 in accordance with 10 U.S.C. § 12731b – Physical disability not incurred in the line of duty.

70.     Without duty-related PEB processing, Mr. Crawford could not be medically retired and receive the benefits rightfully owed to him under 10 U.S.C. § 1201, despite the fact that he was separated for his PTSD, which he incurred in the line of duty during his tours in Iraq, and was rated as 50% disabling by the VA prior to his discharge, Mr. Crawford was not deemed medically retired and, therefore, was denied the benefits rightfully owed to him under 10 U.S.C. § 1201.

## The ABCMR Decision

71.     In order to correct the errors of the Army, in 2015 Mr. Crawford applied to the ABCMR requesting that his 2011 honorable discharge be corrected to reflect a medical retirement for PTSD incurred in the line of duty.

72.     On September 13, 2016, the Army National Guard Bureau issued an advisory opinion recommending approval of Mr. Crawford's request, finding that Mr. Crawford "was not afforded due process for 'PTSD,' in the line of duty" and recommending that he should be provided with "invitational travel orders to the nearest Medical Treatment Facility in order to undergo a Medical Evaluation Board/Physical Evaluation Board; if found unfit for duty, medically retire the Soldier, with an effective date of 22 June 2011, to include all back pay and benefits."  The FLARNG concurred with this recommendation.

73.     On February 28, 2017, the ABCMR issued its final decision, granting relief in part and denying it in part.

74.     Despite the overwhelming evidence acknowledged by the ABCMR that demonstrated Mr. Crawford: (1) was medically separated without the proper due process (and without counseling as to his available options): (2) that his separation was due to his PTSD that was considered service connected and rated at 50% by the VA; and (3) that the SSMDRB had already found his PTSD caused him to fail medical retention standards, the ABCMR refused to correct Mr. Crawford's records to consider him medically retired.

75.     Instead, the ABCMR ordered that Mr. Crawford's records be sent to the Office of the Surgeon General to determine if he should have been referred for PDES processing at discharge.  Furthermore, despite acknowledging that Mr. Crawford was denied due process because of the failure to provide him with the option for a PEB hearing to determine his fitness, the ABCMR's associated evidence and consideration attached to its recommendation suggested that Mr. Crawford should be referred back to an MEB for initial processing stating that Mr. Crawford "may be issued invitational travel orders affording him the opportunity to have his overall medical fitness determined by an MEB and if necessary a PEB in order to determine the disposition of his separation."

76.     The relief ordered by the ABCMR is arbitrary and capricious where the ABCMR acknowledged that Mr. Crawford met all of the required criteria for a medical retirement but recommended that he start from scratch with PDES processing and, in the event he was referred for PDES processing, suggesting that he begin with a new evaluation of his failure to meet retention standards through an MEB evaluation.

**Doctor O'Donnell's Decision**

77.     On April 5, 2017, Dr. Kathryn R. O'Donnell sent a letter to Mr. Crawford (the "O'Donnell Decision") informing him that, pursuant to the February 2017 decision of the

ABCMR, the Fort Belvoir Community Hospital MEB section had determined that his case should not be referred to the "MEB/PEB for failing Army retention standards."

78.     The O'Donnell decision did not discuss any of Mr. Crawford's records detailing his PTSD diagnosis and treatment or the SSMDRB decision and supporting documentation finding that Mr. Crawford had failed medical retention standards, leading to his discharge.

79.     Instead, Dr. O'Donnell concluded that because records from 2010 and 2011 indicated that Mr. Crawford was managing his PTSD through counseling and medication, and because Mr. Crawford appeared for and scored well during his required drill periods from 2009-2011, he "did not fail retention standards IAW AR 40-501, Chapter 3."  Dr. O'Donnell further stated that she did "recognize the diagnosis of PTSD as being service connected, but [the MEB] does not feel it meets the threshold of necessitating referral to an MEB or a PEB."

80.     Thus, despite having, in fact, been found by the SSMDRB to have failed medical retention standards in accordance with AR 40-501 and having been discharged because of it, Dr. O'Donnell, in direct contravention of the substantial evidence before her and the recommendation from the Army National Guard Bureau and FLARNG that Mr. Crawford be afforded PDES processing, denied Mr. Crawford further processing to determine his fitness at the time of his discharge.

### COUNT I – The ABCMR's Decision Denying Mr. Crawford a Military Medical Retirement Was Arbitrary, Capricious, Contrary to Law, and Unsupported by Substantial Evidence

81.     Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 80 above as if fully set forth herein.

82.     10 U.S.C. § 1201 confers a substantive right to monetary benefits against the United States by specifying the disability retirement pay and benefits to be provide to a qualified discharged soldier when they are medically retired.

83.     The overwhelming evidence reviewed by the ABCMR demonstrates that Mr. Crawford should have been medically retired due to his PTSD, and his records should have been corrected to reflect this.

84.     The ABCMR recognized that Mr. Crawford was discharged due to the SSMDRB's finding that Mr. Crawford failed medical retention standards, his medical records support that his disability rendered him unfit to serve, his disability was rated over 30%, and that his disability was incurred in the line of duty.  Yet the ABCMR failed to correct his records to reflect a military medical retirement, despite the clear evidence supporting this conclusion.

85.     The decision of the ABCMR not to correct Mr. Crawford's records to reflect a military medical retirement was unsupported by substantial evidence, arbitrary, capricious, and otherwise contrary to applicable law, statutes, or regulations.  In ruling against Mr. Crawford despite this overwhelming evidence before it, the ABCMR either ignored or unreasonably construed the evidence before it and did not perform its designated duties.

86.     As a direct result of the ABCMR's unlawful actions, Mr. Crawford continues to be deprived of the disability retirement pay and benefits to which he is entitled under 10 U.S.C. § 1201.

**COUNT II – The ABCMR's Referral of Mr. Crawford's Case for a New Initial Determination of PDES Processing Was Arbitrary, Capricious, Contrary to Law, and Unsupported by Substantial Evidence**

87.     Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 86 above as if fully set forth herein.

88.     The ABCMR's decision to refer Mr. Crawford's case to the Office of the Surgeon General to "review the available records to determine if he should have been referred to the

Physical Disability Evaluation System (PDES)" was unsupported by substantial evidence, arbitrary, capricious, and contrary to law.

89.     The ABCMR's findings clearly established that Mr. Crawford should have initially been processed through PDES and afforded with a PEB hearing to determine his fitness. Having found that Mr. Crawford was discharged due to the SSMDRB's finding that he failed medical retention standards, his medical records supported this decision, his disability was rated over 30%, and that his disability was incurred in the line of duty, there is simply no basis for the ABCMR to have concluded that Mr. Crawford should be forced to start from scratch with an initial determination for PDES processing.

90.     Additionally, the ABCMR's suggestion that Mr. Crawford should be se issued invitational travel orders for such processing starting with an MEB is also unsupported in this instance.

91.     Given that the ABCMR found that the SSMDRB determined Mr. Crawford failed medical retention standards at the time of his discharge (effectively serving in the role of the MEB) and that Mr. Crawford was not properly counseled regarding his right to request a PEB hearing, a referral back to an MEB for initial determination is non-sensical.

92.     As admitted by the Army National Guard advisory opinion and acknowledged by the ABCMR in its decision, the main error below was that Mr. Crawford was not provided with, or counseled regarding his rights to, a PEB hearing to determine his fitness.  Referring Mr. Crawford back for an initial PDES determination or a retention standard examination from an MEB simply makes no sense in this situation where the error stems from failure to provide a PEB hearing.

93.     The only logical remedy here given the ABCMR's acknowledgements would be to either order the Mr. Crawford be deemed medically retired (and correct the record itself), or provide Mr. Crawford with a fitness hearing through a PEB.

94.     Thus, the ABCMR's referral to the Office of the Surgeon General for an initial determination on PDES processing and its recommendation that Mr. Crawford then be referred to an MEB to start from scratch is unsupported by substantial evidence, arbitrary, capricious, and contrary to law.

95.     As a direct result of the ABCMR's unlawful actions, Mr. Crawford continues to be deprived of the disability retirement pay and benefits to which he is entitled under 10 U.S.C. § 1201.

## COUNT III – The ABCMR'S Failure to Afford Plaintiff an Opportunity for a Hearing was Arbitrary, Capricious, and Contrary to Law

96.     Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 95 above as if fully set forth herein.

97.     10 U.S.C. § 1214 states that "[n]o member of the armed forces may be retired or separated for physical disability without a full and fair hearing if he demands it."

98.     The ABCMR found that Mr. Crawford was not provided with a PEB hearing or appropriate process when he was discharged.

99.     The ABCMR also found that Mr. Crawford was, in fact, separated from service due to his PTSD, which was incurred in the line of duty.

100.    Rather than offering Mr. Crawford a hearing with the ABCMR or referring him directly to a PEB where he would be afforded an opportunity for a hearing, the ABCMR referred Mr. Crawford to the Office of the Surgeon General for a determination on initial PDES processing.

101.    The ABCMR's failure to provide Mr. Crawford with the required hearing, is directly contrary to the requirement of 10 U.S.C. § 1214, is arbitrary, capricious, and contrary to law, and continues to deprive Mr. Crawford of the disability retirement pay and benefits to which he is entitled under 10 U.S.C. § 1201.

### COUNT IV – The ABCMR'S Failure to Afford Plaintiff an Opportunity for a Hearing Violated His Constitutional Due Process Rights

102.    Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 101 above as if fully set forth herein.

103.    The ABCMR's failure to provide Mr. Crawford with notice and an opportunity to be heard under 10 U.S.C. § 1214 is also a violation of Mr. Crawford's constitutional rights under the Due Process clause of the Fifth Amendment to the United States Constitution.

104.    The Due Process Clause of the Fifth Amendment guarantees that an individual will not be deprived of life, liberty, or property without due process of law.

105.    Mr. Crawford had demonstrated that he is entitled to the benefits afforded for a military medical retirement under 10 U.S.C. § 1201.  These statutory benefits constitute a protected property interest.

106.    As discussed above, 10 U.S.C. § 1214 provides that "no member of the armed forces may be retired or separated for physical disability without a full and fair hearing if he demands it."  Additionally, both AR 40-501, ¶ 10-25 (a), which deals with disabilities not considered to be incurred in the line of duty, and AR 635-40, ¶ 4-23, dealing with disabilities incurred in the line of duty, both provide for a right to a full and fair hearing if demanded.

107.    Because Mr. Crawford was separated due to his PTSD and denied his right to a hearing under 10 U.S.C. § 1214, AR 40-501, ¶ 10-25, and AR 635-40, ¶ 4-21, he was deprived

of a military medical retirement in violation of his Due Process rights under the Fifth

Amendment.

## COUNT V – Doctor O'Donnell's 2017 Decision was Unsupported by Substantial Evidence, Arbitrary, Capricious, and Contrary to Law

108.   Plaintiff re-alleges and incorporates by reference the allegations contained in

paragraphs 1 through 107 above as if fully set forth herein.

109.   Dr. O'Donnell's April 5, 2017 decision is completely unsupported and is

contradicted by the record evidence of Mr. Crawford's PTSD at the time of his discharge.

110.   Despite the clear record detailing Mr. Crawford's diagnosis of his PTSD after his

second tour of duty in Iraq, his VA rating determination of 50% service connected PTSD, and

the SSMDRB's findings that Mr. Crawford had, in fact, failed medical retention standards in

accordance with AR 40-501, Dr. O'Donnell, who is a Doctor of Osteopathy (D.O.), not a mental

health professional, came to the non-sensical and unsupported conclusion that Mr. Crawford did

not fail to meet medical retention standards and should not be referred for PDES processing to a

PEB.

111.   Dr. O'Donnell's decision fails to address any of the evidence of Mr. Crawford's

PTSD at the time of his discharge, including a complete failure to address the SSMDRB findings

or statements ordered as part of the SSMDRB evaluation.

112.   Instead Dr. O'Donnell's decision rests solely on a cherry-picked record of Mr.

Crawford's drill reporting and notes in his medical file from 2010 and 2011 that indicated he was

coping with his PTSD through treatment and medication.

113.   Dr. O'Donnell's failure to address any of the contrary evidence in the record, and

her entry of a conclusion that is completely contradicted by the record of the SSMDRB at the

time of Mr. Crawford's discharge, renders her decision unsupported by substantial evidence, arbitrary, capricious, and contrary to law.

114.    Dr. O'Donnell's arbitrary and unsupported decision to deny Mr. Crawford PDES processing continues to deprive Mr. Crawford of the disability retirement pay and benefits to which he is entitled under 10 U.S.C. § 1201.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that this Court enter judgment against Defendant and award the following relief:

a.    Award Plaintiff disability retirement pay and benefits;

b.    Order that Plaintiff's military records to be corrected to reflect that he was medically retired at the date of his discharge, effective June 22, 2011, having been deemed to have failed medical retention standards and being unfit for continued service, with a disability rating of over 30% for his service connected PTSD, that was incurred in the line of duty;

c.    In the alternative, remand Plaintiff's case to a PEB for a proper determination of his fitness for duty at the time of his discharge and provide Plaintiff with his right to a hearing, as guaranteed by 10 U.S.C. § 1214 and, if the PEB finds he was unfit, medically retire him effective on the date of his discharge, June 22, 2011;

d.    Award Plaintiff interest, costs, and attorneys' fees; and

e.    Grant such other relief as the Court deems just and proper.

December 21, 2018                              Respectfully submitted,

                                              /s/ Stephen J. McBrady
                                              Stephen J. McBrady
                                                      Attorney of Record
                                              Christian N. Curran
                                                      Of Counsel
                                              Crowell & Moring LLP
                                              1001 Pennsylvania Avenue, NW
                                              Washington, DC 20004-2595
                                              Tel: (202) 624-2547
                                              Fax: (202) 628-5116
                                              smcbrady@crowell.com
                                              ccurran@crowell.com


                                              Barton F. Stichman
                                              Rochelle Bobroff
                                              Esther Leibfarth
                                                      Of Counsel
                                              National Veterans Legal Services Program
                                              1600 K Street, N.W., Suite 500
                                              Washington, DC 20006
                                              Tel: (202) 621-5687
                                              Fax: (202) 328-0063
                                              bart@nvlsp.org
                                              rochelle@nvlsp.org
                                              esther@nvlsp.org


                                              *Counsel for John Crawford*